UNITED STATES v. 50¾ DOZEN BOT-
TLES, MORE OR LESS, OF SULFA-
SEB et al.

No. 1648.

District Court, W. D. Missouri, W. D.

April 3, 1944.

Maurice M. Milligan, U. S. Atty., and David A. Thompson and Otto Schmid, Asst. U. S. Attys., all of Kansas City, Mo., and J. L. Maguire, of Washington, D. C., for plaintiff.

I. Frank Rope, Bowersock, Fizzell & Rhodes, and Charles F. Lamkin, Jr., all of Kansas City, Mo., for defendant.

OTIS, District Judge.

The amended information in libel in this proceeding was filed February 14, 1944. It makes reference to two preparations, one known as "Sulfa-Seb," the other as "Sulfa-Ped." The charge is that these preparations are misbranded within the meaning of 21 U.S.C.A. § 352. That section provides inter alia that a drug "shall be deemed to be misbranded—(a) If its labeling is false or misleading in any particular" and that it "shall be deemed to be misbranded— (f) Unless its labeling bears * * * such adequate warnings * * * against unsafe dosage or methods * * * of administration or application, in such manner and form, as are necessary for the protection of users * * *."

The information charges that the labeling of the preparation known as "Sulfa-Seb," which reads, in part, "For hair and scalp * * * Designed as a fungicide to relieve itching, and treat and control the condition resulting from infection round the follicles of the hair," is false and misleading in the following respects: that the article (1) is not an adequate treatment for disease conditions of the hair and scalp; (2) that it is not fungicidal; and (3) that it will not control conditions resulting from infection around the follicles of the hair."

The information charges that the labeling of the preparation known as "Sulfa-Ped," which reads, in part, "A new treatment for Athletes Foot * * * Designed as a fungicide to relieve discomfort and treat and control the conditions identified with fungus and bacterial conditions of the feet * * *," is false and misleading in that the preparation is (1) not a treatment for athlete's foot; (2) is not a fungicide; and (3) will not relieve discomfort and treat and control conditions identified with fungus and bacterial conditions of the feet.

The information alleges that both preparations are misbranded for that the labels contain no such adequate warnings "as are necessary for the protection of users since the articles contain sulfanilamide" and no warnings that "their use [i. e. of the preparations] should be discontinued.

if a new skin rash appears or if the skin condition under treatment becomes worse."

We begin this memorandum by first discussing the first charge in the information, that the preparation known as "Sulfa-Seb" is false and misleading in the respects indicated in the information.

1. There has been no real controversy in the case between counsel for plaintiff and counsel for claimant touching the applicable law. The language of the statute is clear enough. If the labeling "is false and misleading in any particular" the preparation bearing the label has been misbranded. Obviously it is necessary first of all to determine what representation is made by the label and to determine whether that representation is false and misleading in any particular. It would seem to be obvious, moreover, that in determining whether the representation on a label is false and misleading in any particular all the language of the label must be considered. None would contend that single words or phrases should be lifted out and that if those words or phrases separately considered can be found to be untrue, then the preparation should be condemned as misbranded. Single words or phrases might be so explained by other language as that there is no misrepresentation whatever. Fairness requires that the whole legend upon the label of "Sulfa-Seb" should be set out so that the label may be considered as a whole. Accordingly, we do set out the label by inserting at this point one of the labels:

leading and which obviously is not false or misleading. Some of the language is devoted to precise directions as to how the preparation is to be used. Some of it is a guarantee of return of money. A part of it is a warning that the preparation is "for external use only." Some of it describes accurately all of the ingredients in the preparation. Much of that part of the legend which is the object of the government's complaint is in type so small that it would almost certainly escape being read by any ordinary purchaser. The most prominent part of the label is the name of the preparation, "Sulfa-Seb," a name which certainly means nothing and conveys no significance. In somewhat smaller type, and yet in legible type as distinguished from the minute wording of the rest of the label, are the words "For Hair And Scalp." Here is the real representation which is made to the purchasing public. Nine out of ten of the purchasers of this preparation in all probability would read no other part of the label than the words in conspicuous letters "For Hair And Scalp." (What advertising, what circular, what verbal recommendations, may have influenced purchasers we do not know but very reasonably we may conclude that an intention to purchase was formed before the label was read). Let us then first consider whether the For Hair And Scalp is false and misleading.

We agree at once with the contention of the Government in this case that there is an implication in the words "For Hair And Scalp" which constitutes a part of the meaning to the ordinary observer and pur-

Any one who inspects this label will at once discern that it contains much language which is not charged as being false or mis-

chaser. By the use of these words it is represented that the preparation, when applied externally and in the manner pre-

scribed by the directions on the label, is beneficial to the hair and scalp, that the use of the preparation will promote the health of hair and scalp. To say, however, that the words "For Hair And Scalp" alone (as was said in the argument by learned counsel for the Government) would mean to an ordinary observer that the preparation was a panacea for every possible disease that might attack the hair or scalp seems to us grossly to distort the meaning which the reader would derive from the language employed. The reasonable interpretation of the words, considered alone, is that the use of the preparation in the manner directed will benefit the hair and scalp when affected by such commonly known maladies as those causing, for example, dandruff, falling hair, threatening baldness.

When we descend from the words in large type, "For Hair And Scalp," into the legend minutely printed beneath them, we are given the more specific information that the preparation is "Designed as a fungicide to relieve itching" and that it is "Designed as a fungicide to treat and control the condition resulting from infection round the follicles of the hair." Here the words that would mean anything to the ordinary reader and observer (the word "fungicide" would mean nothing except to the rare individual) are the words to "relieve itching" and the words "to treat and control the condition resulting from infection around the follicles of the hair."

The impression then created by this label on the ordinary purchaser and observer, if he reads only the conspicuous words, is that here is a preparation that will be helpful in dealing with such common maladies as dandruff, falling hair, etc., and, if he descends into the minute type, that here is a preparation that will relieve itching in the scalp and that will beneficially affect a condition resulting from infection in the scalp.

With such an interpretation placed upon the label, and we believe it is a fair interpretation, not a far fetched and distorted one, the question is, Is this preparation one which will benefit the hair and the scalp with respect to the common maladies referred to and is it a preparation which will relieve itching in the scalp and will benefit conditions resulting from infection in the hair? If the preparation will do these things it certainly cannot justly be condemned as falsely labeled.

2. The evidence in the case was of two general classes, the testimony of experts and the testimony of laymen. The testimony of the laymen called by the Government (there were only a half dozen of these) chiefly related to the charge of misbranding for failure to warn of dangers. It did not particularly bear upon the charge which we now are especially considering, namely, was the label of "Sulfa-Seb" false and misleading. The testimony of the laymen who testified for the claimants (there were fifteen of these) did directly bear upon this charge, either as against "Sulfa-Seb" or "Sulfa-Ped." But the testimony of a few laymen, however honest that testimony may be (and we regard the testimony of each of the laymen appearing in this case as entirely honest) is of slight value upon the issue under present discussion. There were many thousands of users of these preparations. The evidence indicated that there were hundreds of users even in Kansas City. That a small number experienced unsatisfactory results, which they ascribed to some deficiency or injurious element in the preparation, and that a small number experienced satisfactory results which they ascribed to the preparation, is of small significance. The nature of the simplest disease is so obscure to a layman that his conclusions touching what will benefit it and what will not benefit it mean little. We would not say, of course, that if we were dealing with and had the results of tens of thousands of cases, we would not have something significant. A few dozen instances are of such trifling value as that they can almost entirely be disregarded.

The scientific testimony in a case of this character is the testimony that counts. Scientific testimony is available to support any meritorious cause, even, as we know, when the leading physician in a community or the American Medical Association itself is under attack. Of course, scientific testimony is available to the Government in support of any meritorious cause presented by the Government. The Government has its official staff of scientists of outstanding ability and the government is able to obtain the services of other scientists of outstanding ability. But private individuals also are able to obtain the testimony of outstanding men of science provided there is real merit in their cause. Claimants in this case had the financial ability to obtain testimony. But they put only one so-called expert (we use the word "so-called" ad-

visedly) on the stand. They brought him from San Antonio, Texas, to Kansas City and paid him, according to his testimony, at the rate of $100 a day and, we suppose, his expenses also. (We judge that was the zenith of his professional earnings to the present date).

The testimony of the young M. D. brought by claimants from Texas was pitifully weak. His qualifications were unsatisfactory, his experience in the practice of medicine was brief and limited, his knowledge of the science of the subject under inquiry was obviously slight. He could say "Yes" to leading questions, but if he had been asked to discuss the sciences involved he would have floundered hopelessly. He was spared, if not by merciful counsel (who also were floundering) at least by a merciful court.

There was a reason for the complete failure of the claimants to support their contentions by outstanding expert testimony. That testimony just was not procurable. The failure of the claimants in this respect impressed us as almost the equivalent of a confession of the general accuracy of the testimony of the Government's experts. The general effect of that testimony was that while the preparation "Sulfa-Seb" might have some slight temporary value in some instances by way of relieving an itching scalp or by way of temporarily removing dandruff, it had no real value with respect to any malady of the scalp, whether generally and commonly known or obscure in character and difficult to diagnose. The general effect of the testimony of the experts for the Government, whose qualifications were outstanding, was certainly to the effect that the preparation known as "Sulfa-Seb" constituted no kind of a treatment or control for infection in the scalp and round the follicles of the hair. We are bound to say that the effect of the scientific testimony offered by the Government was overwhelming as against the complete emptiness of the scientific testimony offered by the claimant.

3. Much of what we have said concerning the preparation known as "Sulfa-Seb" is equally applicable to the preparation known as "Sulfa-Ped." We set out here the exact label of "Sulfa-Ped" which the Government has attacked. There cannot be any objection to much of this label. Most of it is entirely true and accurate. But we have reached the conclusion that there is some exaggeration in the label in that part of the legend in which it is represented that the preparation is a beneficial treatment and a control for "the conditions identified with fungus and bacterial conditions of the feet."

### Certain Matters of Evidence

4. During the trial of the case there was offered in evidence by claimants a large number of letters (responses received from purportedly satisfied customers to questionnaires mailed out by claimants). We refused to receive these letters in evidence for reasons which were stated at the time of the ruling. Such letters are so obviously hearsay that the matter of the propriety of the ruling does not seem to us to be at all debatable. No question of the good faith of the manufacturers or of the claimants is involved in this proceeding. The proceeding is not brought against individuals. The proceeding is against inanimate preparations. The preparations,

not individuals, are attacked. There is no reason to question the good faith of any one in this proceeding. We believe the claimants did act in good faith. The only question in the case is, are the labels on the bottles false and misleading in the sense that the information conveyed by them to ordinary readers is erroneous.

■ Another matter of evidence, which was taken under submission, is made up of a number of exhibits, being claimants' Exhibits 14 to 21, inclusive. Objection was made by the Government to the reception of these exhibits. The exhibits were scientific treatises, each of which discusses the uses of sulfanilamide. None of them purport to discuss the particular preparation involved in this proceeding. It seems clear to us that these exhibits were not competent in evidence. The reasons for that conclusion are elementary. Undoubtedly in the cross examination of an expert witness he may be asked whether he agrees or does not agree with certain statements contained in reputable treatises. There is no convincing authority, however, for the view advanced by learned counsel for the claimants in this case, to-wit, that as affirmative proof treatises may be offered in evidence. If the testimony of Dr. X, for example, is desired by a party, he can call him as a witness so that he can be cross examined in court. If he is beyond the jurisdiction of the court, undoubtedly the party can take his deposition, when again he may be cross examined. But it is unthinkable that a party may have some witness (in this instance it was a layman) say that Dr. X is an authority in a certain field and then to offer in evidence some book or treatise which may have been written by Dr. X.

Notwithstanding our views of the law in this regard are very clear, we have read all of the exhibits referred to which were offered in evidence by the claimants. For the purposes of this case we overrule the objection to these exhibits. Nothing contained in the exhibits affects the findings of fact which we shall hereafter make. Findings of fact are made as of the time when the information in libel was filed. What may have been the view of scientific men on dates earlier than that date, of course, is not controlling. The knowledge of scientists, especially in a field so new as that which deals with the sulfa drugs, is a growing knowledge. The science is in the process of evolution. The best views of the ablest scientists two or three years ago may not be especially valuable now.

## Matter of Warnings

The charge of inadequate warnings upon the labels was an afterthought. The original information in libel did not contain that charge. We are satisfied that the evidence does not warrant condemnation of the preparations on account of failure to include warnings.

## Findings of Fact

■ 1. The label "Sulfa-Seb" is false and misleading in that it represents that the preparation labeled is a remedy effective as a treatment for the commonly known maladies affecting the scalp and hair, whereas its only value is in relieving an itching scalp and in temporarily, in some instances, removing dandruff, and it is false and misleading in that it represents that the preparation labeled is a treatment or control for infections in the scalp and round the follicles of the hair.

■ 2. The label "Sulfa-Ped" is false and misleading in that it represents that the preparation labeled is a treatment of and will control the conditions identified with fungus and bacterial conditions of the feet.

■ 3. Neither the labels of "Sulfa-Seb" or "Sulfa-Ped" is misbranded in that it does not contain an appropriate warning of dangers incident to the use of the preparations.

## Conclusion of Law

■ The prayer of the amended information in libel should be granted. The labels on the preparations known as "Sulfa-Seb" and "Sulfa-Ped" seized by the marshal should be condemned. The false and misleading labels on such preparations should be destroyed.

## Judgment and Decree

This cause coming on to be heard before the court, trial by jury having been waived by the parties, and the court having considered the pleadings, the evidence introduced, the argument and briefs of counsel, and being fully advised in the premises:

It is by the court ordered, adjudged and decreed that the labels used on the bottles of "Sulfa-Seb" and the bottles of "Sulfa-Ped" seized by the marshal be condemned and destroyed.

It is further ordered, adjudged and decreed that when the labels have been destroyed, the bottles and the preparations

therein be turned over to the claimants for such further use thereof as the claimants lawfully may make.

It is further ordered that the costs of this proceeding, together with the cost that may be incident to removing and destroying the condemned labels and returning the unlabeled bottles to claimants, shall be paid by claimants.